JACKSON, *ex dem.* TRACY, *against* HAYNER.

THE SAME, *ex dem.* THE SAME, *against* FERGUSON.

THESE were actions of *ejectment*, to recover a farm in the town of *Laudlake*, in the county of *Rensselaer.* The evidence was taken out of court, and a case settled by consent of the parties.

*Abraham Frear* was the source of the title, both of the plaintiffs and defendants, and held under a lease in fee, from *Stephen Van Rensselaer*, dated *September* 22d, 1790. On the 13th of *September*, 1800, by an instrument, endorsed on the lease, *Abraham Frear*, and wife, assigned the premises to *James Morrison*, in fee, and the point on which the causes turned, was, that this assignment had been obtained by fraud. The plaintiffs' lessor claimed through *Morrison*, under a sale, by virtue of an execution. In 1802, *Abraham Frear* devised the premises to his son, *John Frear;* and, afterwards, in 1804, conveyed part of the same to the defendant, *Ferguson.*

*Pownal Hitchcock*, the principal witness to prove the fraud, testified, that he wrote the assignment on the lease, at the request of *Samuel Frear*, a son of *Abraham Frear*, and at *Samuel Frear's* house. After it was written, *Samuel Frear* called his father out of another room, who appeared reluctant to execute it. The only persons present were *Samuel Frear*, and his wife, *Abraham Frear*, and his wife, and *James Morrison.* *Abraham Frear* asked what the writing was; whereupon the witness proposed to read it, but *Samuel Frear* told him not to do so, for that the old man would not understand it, and he did not wish him to. *Abraham Frear* asked *Samuel*, whether it would not hurt him; to which he replied, that it was only a bargain or agreement, between him (*Samuel*) and *Morrison*, and could not hurt him. *Abraham* said to his son, that he did not like to sign it; and that he was not fit to sign any paper. After some conversation between *Abraham* and *Samuel*, the former, with his wife, executed the assignment.

*Abraham Frear* was an illiterate man, not being able either to read or write. The execution of the assignment was proved by

Where an illiterate man is induced to sign a deed, by a misrepresentation of its nature and contents, the deed is void.

*Hitchcock*, before *Levi Rumsey*, a judge of the Common Pleas of *Rensselaer* county, and also a justice of the peace. It appears that, for the purpose of procuring the attendance of *Hitchcock* before the judge, to prove the execution of the assignment, a fictitious suit had been instituted between two persons, of the name of *Dole* and *Tanner*, in which he was subpœnaed as a witness. *Hitchcock* testified, that when he appeared before the justice, he informed him that his evidence was wanted respecting a bet. When *Hitchcock* was sworn, the justice asked him if he saw *Abraham Frear*, and wife, sign the assignment, and if he did it voluntarily; to both of which questions, he answered, yes; and when about to mention the circumstances attending the transaction, the justice interrupted him; and there the trial before the justice ended. It appears that upon the evidence thus taken before him, the justice, as judge of the Common Pleas, made his certificate of proof of the execution of the assignment, which was dated the 25th of *December*, 1813. The witness, on his cross-examination, said, that the conversation between *Samuel Frear* and his father, was held in *Dutch*, which language he did not understand. On being asked how he understood that the old man was reluctant to sign the assignment, he said that he understood it by his motions. *Samuel Frear* talked in *Dutch* to the old man, and pointed to the assignment, and the old man shook his head, and said "*naen*," by which he understood him to mean, that he did not like to sign it. The witness said, that he did not mean to say that he heard old Mr. *Frear* say that he was not fit to sign any paper; and that at a circuit court held at *Troy*, several years since, in an action between *Morrison* and *Ferguson*, respecting the premises, he testified substantially the same as he had now done. The trial last mentioned by the witness, was, as appeared from the testimony of *Abraham Van Vechten*, held in 1808, who also confirmed what the other witness said, that the testimony of *Hitchcock* was substantially the same on this as on the former occasion.

There was a mass of evidence detailed in the case, which it is unnecessary to set forth, as all the material parts are referred to, and stated in the opinion of the court.

*Buel*, for the plaintiffs, cited *Peake's N. P.* 146.   2 *Dall.* 95.
2 *Johns. Rep.* 404.   4 *Cruise's Dig.* tit. 32. ch. 2.   2 *Caines' Cases in Error*, 47.

*Van Vechten*, contra, contended, that the assignment from *Frear* to *Morrison* was fraudulent; and that *Morrison* was not seised at the time of sale, and that the sheriff's deed was void. He cited *Jackson* v. *Rumsey*, 3 *Johns. Cases*, 236. 4 *Johns. Rep.* 163. *Cro. Car.* 303, 304. 2 *Co.* 59. 1 *Burr.* 112. 1 *Johns. Cases*, 34. 1 *Caines' Rep.* 84. 4 *Johns. Rep.* 390. 6 *Johns. Rep.* 197. 218. *Gilb. Ex.* 42. *Co. Litt.* 222. 2 *Cruise's Dig.* 72. s. 43. 1 *Bac. Abr. Assign.* 157. (A.) *Co. Litt.* 214. *Roll. Ab.* 176. *Skinn. Rep.* 6—26.

NEW YORK, Oct 1815.

JACK-ON v. HAYNER.

YATES, J., delivered the opinion of the court. The only question in these cases, is, whether the assignment from *Abraham Frear* to *James Morrison*, of the 13th of *September*, 1800, and endorsed on the lease from *Stephen Van Rensselaer* to *Frear*, of the 22d of *September*, 1790, is fraudulent and void.

If the facts stated by the subscribing witness to this assignment, are true, there can be no doubt that a gross and unexampled imposition has been practised on *Abraham Frear*, who, it is alleged, executed it. *Pownall Hitchcock*, the witness alluded to, states that he wrote the assignment at the request of *Samuel Frear*, who, after it was written, called his father out of another room, who appeared reluctant to execute it, and asked what it was. The witness then proposed to read it to him, which *Samuel* told him not to do, that he would not understand it, and he, *Samuel*, did not wish him to read it; and it was not, therefore, read to him. The old man then asked whether it would not hurt him; to which *Samuel* replied "no," that it was only a bargain between him, *Samuel*, and *James Morrison*; upon which he said he did not like to sign it; he was unfit to sign any paper. That after some conversation between them, he and his wife executed it. In opposition to those facts it is, however, urged, that this witness is not to be believed, because he had previously appeared before *Levi Rumsey*, one of the judges of the court of Common Pleas, of the county of *Rensselaer*, to prove the assignment, and stated differently: and because he declares that *Abraham Frear* spoke in *Dutch*, and that he did not understand that language; neither of these objections are true, to that extent, as can invalidate his testimony.

The information he gave to the judge, as far as he went, when he appeared before him, is not materially variant from what he relates now; and, according to Mr. *Van Vechten's* evidence, it is

the same with what he testified on the trial of the ejectment for the same premises, in 1808. The witness says, he stated to Judge *Rumsey*, that *Abraham Frear* signed it voluntarily, and that when he was about to relate the transaction more particularly, the judge interrupted him. That he intended to proceed with his relation is probable, because it appears he had, on a former trial, given evidence, specially stating the circumstances which took place when the assignment was executed, and Judge *Rumsey* himself, in his evidence, does not expressly deny the fact mentioned by him, as having occasioned the interruption, but generally states, that *Hitchcock* was examined by him, on oath, in the usual form of the examination of witnesses to prove deeds, and that he examined him as fully as is usual, to all the circumstances required by law; that the evidence is stated correctly, but not verbally, in the certificate. All this may be true, and yet if the witness had (as he intended) related the whole of the circumstances, it would have given a different aspect to the transaction, from what now appears by the certificate of proof, endorsed on the assignment. The unusual and extraordinary method resorted to, by instituting a fictitious suit to enforce the attendance of a subscribing witness to prove a deed, is, in my view, highly improper; particularly where the justice of the peace, and judge, (for Judge *Rumsey* acted in both capacities,) did not know, as he declares, at whose instance, or for whose benefit, such fictitious suit was instituted. It was certainly exercising the powers of a justice of the peace for a purpose different from what the statute, giving to justices jurisdiction of causes to be tried before them, ever contemplated. In *Jackson* v. *Schoonmaker*, (4 *Johns. Rep.* 163.) we have said that the acknowledgment and proof of deeds is merely for the purpose of recording them, and is not conclusive on the opposite party; such proof being *ex parte*, and that the party who is to be affected by the deed can, at any time, question its validity. Perhaps few cases could be presented, showing the propriety of this decision more conspicuously than the present; for if a contrary principle had prevailed, and this investigation had not been permitted, it is evident that the truth, as to the execution of this instrument, could never have been brought forward in a court of law.

The plaintiffs' own witnesses show that *James Morrison* and *Samuel Frear* were men of bad reputation. *Frederick Carpenter* says, that *Samuel Frear* was a rogue, and *James Cole*

says *Morrison* was a man of bad character before he left the *Beaver Dam.* What brought him, after that period, to the state prison, does not appear. At any rate, they appear to be men peculiarly fitted for a transaction like the one before us, and of which they are charged to be guilty through interested motives. The confession of *Samuel Frear* to *Cole*, shows his object, and the difference in the value of the farms was evidently the advantage *Morrison* expected to derive from it. *Samuel Frear* mentioned to *Cole* that he knew the *Greenbush* farm was worth considerably the most, but that he got the lease assigned to *Morrison* to prevent his brother, *John Frear*, from having the farm, as the old man had devised his property to *John.* In this he was not mistaken, for it appears to have been the intention of the old man to do so, both before and after this transaction, as he did eventually give his estate to his son *John*, by his last will and testament.

The fact that *Samuel Frear* went into possession of the *Beaver Dam* farm, in the fall of 1800, does not operate in favour of the validity of the assignment. It would have been otherwise, if *Abraham Frear*, the father, had taken possession of that farm; but the entry and possession, by *Samuel*, was no more than what might be expected he would do, without delay, to consummate the intended fraud. The old gentleman never went into possession, but continued on his farm at *Greenbush;* so that the possession taken by *Samuel* rather militated against the legitimacy of the assignment; particularly, as the father did not accompany the son when he took possession; and according to the alleged declaration of the father, to one of the witnesses, his son, *Samuel*, was to maintain him after the exchange of farms.

The circumstance of the assignment's being endorsed on the lease will not strengthen it; because *Abraham Frear* was ignorant and illiterate, and must have supposed that he and his wife subscribed as witnesses to the agreement, which *Samuel* told him he had made with *Morrison;* and although it must be admitted that his being ignorant and illiterate will not avoid the deed, if even it was not read to him; yet, where the deed is requested to be read, and it is not done, that is sufficient to avoid it. (*Hullenback* v. *Dewitt*, 2 *Johns. Rep.* 404.) In this case, the conduct and conversation of *Abraham Frear*, when he came into the room, amounted to a request to have it read to him. He asked what it was, and whether it would not hurt him to sign it;

NEW-YORK, and when *Hitchcock*, who drew it, proposed to read it, *Samuel*
Oct. 1815. interposed, by misrepresenting the nature of the instrument he
JACKSON was to sign.
v.
BAYNER.     The operation of this instrument on the right of *Abraham
Frear*, is alone sufficient to stamp it with fraud, because, by it,
he parted with the farm at *Greenbush ;* and the *Beaver Dam* farm,
as appears in evidence, was conveyed by *Morrison* to his two
sons, *Samuel* and *Frederick*, without any obligation from them
to him. This certainly was never intended, even, according to
the recognitions and confessions of the father, alleged to have
been made to *Frederick Carpenter,* a witness relied on by the
plaintiffs' counsel. That witness says, the old man declared,
at the time, that *Samuel* was to maintain him ; yet no security
for such maintenance was given, and he parted with his pro-
perty without it. This, of itself, renders the whole incre-
dible.

It appears to me, that this transaction has continued through-
out enveloped in the same darkness and mystery with which
the business commenced, when, according to *Cole's* testimony,
*Samuel Frear* and *James Morrison* first went to view the *Beaver
Dam* farm in the night, and slept in the haystack.

It is always dangerous to rely on the loose declarations of a
party, to prove a conveyance of real estate ; particularly
when the testimony of the subscribing witness is attended with
corroborating circumstances, showing the probability of his
speaking the truth. The evidence of the witness ought to out-
weigh any parol proof, as to subsequent verbal recognitions
on the subject, unaccompanied by the acts of the party, also
showing it. In this instance, no such act appears ; for it is
evident that *Abraham Frear* never took possession of the *Bea-
ver Dam* farm, which was not even assigned to him ; it there-
fore cannot reasonably be supposed that he intended to part
with this property, without any advantage to himself ; not even
security for his maintenance from *Samuel*, which, according to
an alleged confession to one of the witnesses, made by him, as
before stated, was part of the arrangement in making the ex-
change. We are, accordingly, of opinion, that the assignment
endorsed on the lease from *Stephen Van Rensselaer* to *Abraham
Frear*, is fraudulent and void, and that judgment be entered in
both these causes for the defendants.

                                        Judgment for the defendants.