HEARD APRIL TERM, 1877.

## MONTGOMERY *vs.* SCOTT.

Where a party brings an action for equitable relief from a bond and mortgage which she had executed, against a *bona fide* holder for value, who received them through the hands of a third party without any notice or suspicion of the fraud, it is not enough for the plaintiff to show that she was induced to execute the instruments by the false and fraudulent representations of such third party, but she must go further and show that the execution was without negligence on her part, and this, although she was old, infirm and illiterate.

BEFORE CARPENTER, J., AT RICHLAND, FEBRUARY, 1877.

This was an action by Eliza Montgomery against Edwin J. Scott & Son and Clifton J. Houston to set aside a bond and mortgage for one thousand dollars to the said Edwin J. Scott & Son, bearing date the 1st day of April, 1875. The mortgage was of a lot, with buildings thereon, in the city of Columbia, and was recorded 22d April, 1875. The complaint alleged that at the time the plaintiff executed the said instruments she was old, infirm and uneducated, not able to read or write, and, by reason thereof, was incapacitated from attending properly to business; that on that day Clifton J. Houston, one of the defendants, fraudulently taking advantage of the plaintiff's said incapacity and ignorance, procured her to sign the said bond and mortgage, which he falsely and fraudulently represented to be a recognizance for his appearance at Court in May, 1875, to answer to a bill of indictment; that the plaintiff signed said writing, believing that she was signing a paper to keep Houston out of jail, but, that having been since informed of the true character of the instruments, she has demanded of the defendants, Edwin J. Scott & Son, that the said bond and mortgage be canceled; that she has never had any transaction with the said Edwin J. Scott & Son, nor did she receive any consideration for the said bond and mortgage. The prayer of the complaint was that Edwin J. Scott & Son give up said bond and mortgage to be canceled, and that the same be marked null and void.

The complaint was served on the defendants in December, 1875. Houston neither appeared nor answered. Edwin J. Scott & Son answered in January, 1876, denying all knowledge of the fraud charged, if any there was, which they did not believe, and stated as a defense that they did, in the course of business as bankers, and for full consideration, and without notice or suspicion of fraud, receive the joint and several bond of the plaintiff and the defendant, Houston, secured by the mortgage of the plaintiff, as mentioned in the complaint.

By an order dated March 28th, 1876, J. P. Carroll, Esq., was appointed Referee to hear and determine all the issues of law and fact in the case.

On the 14th of October, 1876, the Referee submitted his report as follows:

By the order of March 28th, 1876, herein made by His Honor R. B. Carpenter, I, the undersigned, J. P. Carroll, was appointed Referee to hear and determine all the issues of fact and law in the above entitled case. The attorneys, respectively, of the plaintiff, Eliza Montgomery, and the defendants, Edwin J. Scott and Henry E. Scott, have appeared before me, have produced their witnesses and proofs, and have submitted arguments on behalf of their respective clients. The defendant, C. J. Houston, has neither pleaded to the complaint nor appeared to the action. Of the evidence adduced, a statement will be found in the within papers accompanying this decision.

The plaintiff by this action seeks to have annulled and delivered up to be canceled the bond and mortgage mentioned in her complaint. She demands this relief upon the ground that she was induced to execute the written instruments referred to by the false and fraudulent representations of the defendant, C. J. Houston, that they were nothing more than a bond for his appearance at the Court of General Sessions to answer to a bill of indictment to be there preferred against him. This charge of fraud against the defendant Houston is fully sustained by the testimony of the plaintiff herself and of Eliza Levy, who was examined as a witness on her behalf, if their testimony is to be believed. But it is urged on the part of the defendants, E. J. Scott & Son, that both those witnesses have been contradicted directly by other and unquestionable evidence in the cause in regard to several of the circumstances to which they testify as connected with the execution of the bond and mortgage referred to, and that their testimony ought, therefore, to be wholly rejected. That two separate papers (the bond and mortgage to the defendant Houston) were executed by the plaintiff cannot well be doubted, and it is certain that afterwards two other separate papers (the bond and mortgage to the defendant, E. J. Scott & Son,) were also executed by the plaintiff. Yet the plaintiff and the witness, Eliza Levy, both testify in effect that upon each of these occasions but a single paper was signed by the plaintiff. So, likewise, the strong probability seems to be that there must have been an interval of some weeks between the plaintiff's execution of the bond and mortgage to the defendant Houston and her execution of the bond and mortgage here in question. Yet the plaintiff and Eliza Levy both testify positively that that interval was but a single day. The plaintiff also testifies that Eliza Levy was present

when she (plaintiff) signed the papers attested by W. A. Carr and W. Rose, as subscribing witnesses, and *they*, on the contrary, state that Eliza Levy was not so present. The testimony of these witnesses, the plaintiff and Eliza Levy, as I apprehend, cannot, however, be wholly discredited because of these misstatements, unless they were willfully false or at least made recklessly and without due regard to the oath they had taken. The plaintiff, in her testimony as to what occurred when the bond and mortgage were made to the defendant Houston, does not say positively that she then signed but one paper. Her statement is that she "*thinks* she signed but one paper" on that occasion. The confident statement of the witness, Eliza Levy, that but one paper was *then* signed by the plaintiff is weakened by another part of her own evidence. She was certainly not immediately present throughout the whole of the interview between Houston and the plaintiff, for she says that while Houston read aloud a paper to the plaintiff she (the witness) was in an adjoining room and could hear him reading, but could not understand the words. For aught that appears to the contrary, the plaintiff might have signed one paper while the witness was absent from the room and another after her return, and the witness having seen but the one paper signed might naturally have supposed that it was the only one then executed. As to the number of papers signed by the plaintiff when the bond and mortgage now in question was executed, the witness, Eliza Levy, does not testify positively, but two papers, she states, were signed by the plaintiff for Houston "so far as witness knows," and the witness "thinks she must have known the fact had the plaintiff signed any other paper." This witness and the plaintiff must be regarded as incorrect in their testimony as to the time which intervened between the signing, at the request of Houston, of the several papers of which they speak. But dates are difficult of remembrance, and the plaintiff's age naturally suggests its usual incident, an infirm memory. As the witness, Eliza Levy, according to her testimony, was present very shortly before and also immediately after the plaintiff's signing the last of the papers which she executed for Houston, it may well have been that the plaintiff failed to notice her absence in the interval and was thereby led into the mistake of supposing that the witness was present at the moment of her signing the same. Eliza Levy is a negro woman and was then living with the plaintiff in the capacity of her servant, as I infer, and it may well have happened, under

the circumstances stated, that her presence upon that occasion was not observed by the witnesses Carr and Rose.

The contradiction and disproof of the several statements referred to of the plaintiff and Eliza Levy certainly tend to cast doubt and suspicion upon their whole testimony. But, on the other hand, there is not wanting evidence which operates to sustain these witnesses in the more important facts to which they testify. The plaintiff's testimony as to what occurred when she signed the bond and mortgage here in question is confirmed in all essential particulars by the subscribing witnesses Carr and Rose, and, in especial, when they testify that Houston said to her "that there was something wrong about those papers you signed the other day; that they were legal papers, and had to be drawn carefully; that he had brought some other papers to be signed by her, and they were just like those that she had already signed;" and that the papers were not read to her, and that they (the witnesses) did not read them and knew nothing of their contents or purport. The plaintiff is a mulatto, is old and illiterate, being unable to read or write, and seems to have had great confidence in Houston; while he is intelligent, shrewd and utterly unscrupulous. She seems to have been an easy subject for the fraud which she charges upon him, and he entirely capable of perpetrating it. He was proved to be of "very bad general character," and unworthy of belief, and the counsel for the defendants, E. J. Scott & Son, admitted that he was so. They examined him as a witness, and did so, as announced by their counsel, not because they had the least confidence in his testimony, but because they wished to avoid all appearance even of suppressing any of the facts connected with the execution of the bond and mortgage which they held against the plaintiff. In *Belcher* vs. *Connor*, (1 S. C., 90,) the rule of law as declared by the Court seems to be that the testimony of a discredited witness is not to be *wholly* rejected, but may be considered in estimating the weight of other evidence in the case. If, for this purpose, the testimony of Houston be examined, it will be found that, in one most important particular at least, it indirectly but strongly supports and confirms the testimony of the plaintiff. He testifies that some time in April, 1875, in a conversation with the plaintiff about his pecuniary troubles and embarrassments with the defendants, E. J. Scott & Son, the plaintiff "volunteered to aid and assist him by giving, as a security for his debt to those defendants, a mortgage upon her

house and lot in the city of Columbia. That the plaintiff, in her aged and helpless condition, should propose of her own accord, and without any request from him, to encumber with a lien for so large a sum almost the entire property and estate which she owned, and for the purpose of securing the debt of another, unconnected with her by blood or affinity, is a story too strangely and wildly improbable to be believed. It was also in evidence that, about the time the bond and mortgage here in question was executed, the defendant, C. J. Houston, had been arrested under a warrant for fraudulent breach of trust, John Agnew being the prosecutor; and it should be added that no attempt was made to impeach the testimony either of the plaintiff or Eliza Levy upon the ground of their general character. With the conflict of testimony presented, the safer and more satisfactory course, perhaps, would have been to have submitted to a jury the issue between the parties as to the fraud which the plaintiff alleges against the defendant Houston. Upon consideration of the whole evidence, my judgment (after much hesitation, however,) is that the testimony of the plaintiff and of Eliza Levy has not been discredited as to the fraud which they charge upon the defendant Houston. It is "rash and unphilosophical," says a distinguished writer, "to reject the substance of a story by reason of some diversity in the circumstances with which it is related."—Stark. on Ev., 831, note 1.

It is urged on behalf of the defendants, E. J. Scott & Son, that, though the bond and mortgage in their possession were procured from the plaintiff by the fraud of Houston, yet the plaintiff's proper remedy is by a proceeding against *him*, and that she cannot be allowed to impeach those securities in their hands, because they (Edwin J. Scott & Son) obtained the same from C. J. Houston in good faith, and upon valuable consideration, and without the slightest notice or suspicion of such fraud. The law, as adjudged in *Thoroughgood's* case, (2 Coke, 9 b,) has never been overruled, as I believe. It was then held that when a deed is procured by false representation of its purport and effect it is invalid and void, and that it is not material whether such representations be made by the grantor or a stranger, "so as he who maketh the writing be thereby deceived." Nor will it vary the result though the obligee was not aware of the fraud until after he had accepted the bond.— *Schuylkill County* vs. *Copley*, 57 Penn. R., 383; 5 Am. R., 441. It is further contended that the defendants, Edwin J. Scott & Son,

should be regarded as having purchased the bond and mortgage in question for valuable consideration without notice of the fraud alleged. It may well be doubted whether such defense can avail them. In *Maybin* vs. *Kirby* (4 Rich. Eq., 105,) it is held "that the assignee of a chose in action is not within the rule which protects a purchaser for valuable consideration without notice, and that the assignee takes such interest as the assignor had, and is bound by all the equities binding upon the latter;" and such, undoubtedly, is the general rule in regard to all unnegotiable instruments.

After due consideration, I find as matters of fact:

1st. That between the seventh and the twenty-second days (inclusive) of April, 1875, the plaintiff, Eliza Montgomery, executed the bond and mortgage mentioned in the complaint, and now held by the defendants, Edwin J. Scott & Son, and that the said plaintiff was induced to execute the said instruments by the false and fraudulent representations of the defendant C. J. Houston; that they were but a bond, in the penalty of one thousand dollars, conditioned for his appearance at the Court of General Sessions for the said County of Richland to answer to a bill of indictment to be then preferred against him.

2d. That upon the execution, by the plaintiff, of the said bond and mortgage deed, the same passed into the hands of the defendant, C. J. Houston, and, on or about the twenty-second day of April, 1875, were delivered by him to the defendants, Edwin J. Scott & Son, to secure a debt of some sixteen hundred dollars which he owed them for so much money by them lent and advanced to him; that upon receiving from said C. J. Houston the said bond and mortgage deed, the defendants, Edwin J. Scott & Son, delivered and returned to said C. J. Houston other securities for his said debt which he had previously deposited with them, amounting to a large sum, and that when the said bond and mortgage deed were so delivered to them by the said C. J. Houston, they, the said Edwin J. Scott & Son, had no knowledge, notice or suspicion of the said fraudulent means by which said C. J. Houston had procured the said bond and mortgage from the said plaintiff.

And I also find as conclusions of law:

1st. That the said mortgage deed in the hands of the defendants, Edwin J. Scott & Son, is invalid and void, and that the plaintiff is entitled to have the same delivered up and canceled.

2d. That the said bond of the plaintiff, in the hands of the said Edwin J. Scott & Son, is, as against her, also invalid and void, and that the said plaintiff is entitled to have the same canceled as against herself as one of the obligors of the same.

3d. And that the costs of all the parties to this suit ought to be paid by the defendant C. J. Houston, and I direct that judgment be entered accordingly.

The plaintiff excepted to so much of the report as directed that the costs be paid by the defendant Houston. The defendants, Edwin J. Scott & Son, also excepted to the report on the grounds:

I. They except to the finding of the Referee as to the matters of fact numbered 1st in his report for the following reasons:

1st. That from the weight of the evidence he should have found to the contrary, and that no fraud was committed on the plaintiff.

2d. That to upset the deed of the plaintiff the testimony should have been free from suspicion of interest, uncontradictory in itself, and corroborated by testimony of persons and circumstances free from suspicion likewise; whereas the case of the plaintiff relies almost altogether on her own testimony, contradictory in itself, admitted to be found false in certain particulars, and relying mostly for corroboration on that of her dependent and co-dweller in the same house, Eliza Levy, evidently concerted with her and liable to precisely the same objections as her own.

II. They except to the general finding on matter of law of the Referee, to wit: That, supposing the fraud to have been committed, as found by him, and these defendants to be innocent of the same or any knowledge of it, and to have parted with full value for the bond and mortgage, as also found by him, the plaintiff has redress as against these defendants, and the right to have the bond and mortgage aforesaid delivered up and canceled as to these defendants, and except for the following reasons:

1st. That these defendants, though undoubtedly *bona fide* holders for valuable consideration without notice, are not purchasers of the securities in the sense of the common signification of the term purchaser as used by the Referee, but are actual parties to the same, and not assignees of a chose in action as claimed, and as such parties used due diligence.

2d. That the plaintiff, the defendant Houston, and these defendants, all being parties to the same transaction, and the plaintiff

having chosen to place confidence in the defendant Houston, and thereby negligently enabled the defendant Houston to defraud these defendants, and more especially having made a bond and mortgage to the defendant Houston, whereby he was enabled to impose upon their confidence, and, in spite of due diligence on the part of these defendants, to defraud them out of securities of even greater value, the well known rule of law should be applied, to wit: That whenever one of two innocent parties must suffer by the acts of a third, he who has enabled the third party to occasion the loss must sustain it.—Kerr on Frauds, 137.

3d. That these defendants are *bona fide* purchasers for valuable consideration without notice, and as against them equity will not relieve.

III. They except to the special findings of law of the Referee numbered 1st and 2d, ordering the bond and mortgage to be delivered up and canceled, for the reasons before given, and because the same are contrary to the law and the evidence.

The decree of His Honor the Circuit Judge is as follows:

On hearing the pleadings, evidence and report of the Referee in this case, and argument of counsel for the plaintiff and defendants, it is ordered that the exceptions be overruled, and the report of the Referee be and is confirmed.

Both parties appealed.   Edwin J. Scott & Son upon the ground that the Circuit Judge erred in overruling their exception to the report, and the plaintiff upon the ground that· he erred in overruling her exceptions.

*Rhett,* for Edwin J. Scott & Son, after commenting upon the testimony and the report upon the facts, said he did not deny the rule laid down in *Thoroughgood's* case "that a deed procured by false representations of its purport and effect is void, whether such representations are made by the grantor (grantee?) or a stranger;" but contended that since that decision was made an important qualification had been added to the rule by numerous cases for which the occasion did not arise in *Thoroughgood's* case.   The qualification is this: "That the grantor must have used due diligence; must have been guilty of no negligence when this defense is sought to be used against an innocent party who has parted with full value."   The

second resolution in *Thoroughgood's* case laid down the rule which is considered appropriate to ours, and that is "that an illiterate man need not execute a deed before it is read to him in a language he understands; but if he do, without desiring it to be read, the deed is binding." He commented on the position of the plaintiff and the authorities relied on on her behalf, and then proceeded as follows:

We contend that when a person is deceived by a third party into signing a paper entirely different from what he was informed that he was signing, and the grantee, for value in the case of a deed, or purchaser for value in the case of a negotiable instrument, is innocent of all participation in the fraud or knowledge of it before he parted with value, the party signing is liable on the paper notwithstanding, unless he be guilty of no negligence in so signing, and it is incumbent on him to show that he is not. Of course we are here presuming as a matter of fact that we have satisfied the Court that the plaintiff was guilty of negligence. If not entirely, we think that some of the cases that we will cite will satisfy them on this point.

It is conceded (to be perfectly fair) that the majority of the cases hereafter cited (not all) are on instruments originally negotiable; but we contend that the reason of the rule is not drawn from the negotiability of the instrument, (fitting equally such a case as our own, possibly not the assignee of a chose in action,) but rather from the well known rule of law stated in the second exception on matters of law, "that whenever one of two innocent parties must suffer by the acts of a third, he who has enabled the third party to occasion the loss must sustain it." It is his negligence that has enabled the third party. Without that he could not be held liable.

Moreover, it is asserted on our part that this is not simply a point contended for by us from our own deductions, but that it is plainly to be seen in the cases cited by us. Moreover, in notes to *Basset* vs. *Nosworthy*, L. C. in E., edition 1852, p. 71, and *Swan* vs. *Ligon*, 1 McC. Ch., 232, it is said in ascertaining who is a purchaser for value without notice we may resort to the analogies of the commercial law.

The first and leading case that we cite on our side (not meaning, however, to omit the second resolution in *Thoroughgood's* case, cited before,) is *Shirts* vs. *Overjohn*, Supreme Court of Missouri, May

Term, 1875, reported in Central Law Journal of 2d July, 1875, pp. 423, 424 and 425. Special attention is respectfully requested to this case, and more especially the able note of the editor, summing up the whole doctrine and giving a full *resume* of all the principal cases, English and American.

The syllabus of the case is as follows :

" When it appears that the party sought to be charged intended to bind himself by some obligation in writing, and voluntarily signed his name to what he supposed to be the obligation he intended to execute, having full and unrestricted means of ascertaining for himself the true character of such instrument before signing it, but neglecting to avail himself of such means of information and relying on the representations of another as to the contents of the instrument, signed and delivered a negotiable promissory note instead of the instrument he intended to sign, he cannot be heard to impeach its validity in the hands of a *bona fide* holder."

The fact of the case is that the party thought he signed a receipt, but in fact he signed a note. He did not read the paper, nor did he have it read to him.

In the last part of the decree, (p. 425) the observations of the Judge in *Briggs* vs. *Ewart*, respecting the qualification of negligence, and announcing the broad doctrine that to be binding the instrument must be executed as and for the paper it purports to be, and if the party did not intend he cannot be held bound at all, are expressly disapproved.

In the able note of the editor, appended at the close, referring to an attempted distinction in favor of parties whose signatures are obtained when they are unable to read, it is said " he ought, before becoming a party to a written obligation, to have its contents examined by some person in whom he may reasonably place confidence; and even then, if his confidence should be misplaced, he ought to suffer for the wrongful act of his agent rather than be allowed to shift the burden to the *bona fide* holder."

The next case we refer to is *Indruck* vs. *Clemens*, Central Law Journal, 1876, p. 28. It is in the same direction. Also a case before the Supreme Court of Pennsylvania, *Brown* vs. *Reed*, Central Law Journal, 1870, p. 83. This case bears but indirectly, but goes to show how far the Courts will go in the direction we claim.

We would like next to call attention to the short but able editorial in the Law Journal of March 10, 1876, on p. 153, on the point

that the rule is not confined to instruments negotiable in their inception, and to the case cited in it of *Lickbarrow* vs. *Mason*, (2 T. R., 70,) whence comes the rule laid down in the second exception on law, and thence taken from Kerr, 137.

The next case is that of *Citizens' National Bank* vs. *Smith*, Superior Court of New Hampshire, Central Law Journal, March, 1876, p. 163. This case is similar to *Shirts* vs. *Overjohn* as to the facts. It is very full, ably argued and decided,—more than any other that I have been able to find. Special attention to it is respectfully requested, more specially to the opinion of Chief Justice Cushing, on page 166, where, in closing, he rests his doctrine, not on commercial law but on the broad rule laid down in *Lickbarrow* vs. *Mason*, by Ashurst, and quoted by him: "We may lay it down as a broad principle that whenever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." Cushing says: "This rule is based on a sound legal principle and commends itself to the good sense of every intelligent person. It has long been established by numerous authorities, both English and American."

As to the point, what constitutes a purchaser for value, in its fuller sense, as distinguished from the special case of an assignee of a *chose* in action, I would refer to the case of *Basset* vs. *Nosworthy*, and notes thereon, and especially to page 50: "If two parties are deceived, the latter (the holder or grantor) is not bound to postpone his rights to amends."

Also, *Zorn* vs. *Railroad Company*, 5 S. C., 90.

See opinion of Judge Maher, quoting Chancellor Walworth, on page 97, on that point, and that of Associate Justice Willard confirming Circuit decree.

It is clear that we are within the rule of that case as to purchasers.

As to the third exception under the head of findings of law, that as against these defendants, *bona fide* purchasers for value without notice, equity will not in any case relieve, but leave the party entirely to his remedy at law, the case being one of pure exclusive equity jurisdiction, and one in which it is not possible for the Court to do equity to the defendant also by restoring him to his original position, or decreeing compensation therefor, we cite as authorities: Fonb. Eq., 412; Adams' Eq., 191, *et seq.;* Jeremy Eq., 487, 488; Kerr on Frauds, 48, 51, 137, 138, 312, 313, 413; *Basset* vs.

*Nosworthy*, Lead. Cas. Eq., Vol. 2, Part I, pp. 2, 34, 41, 42, (notes) 50; Story's Eq., Vol. 1, pp. 75, 77, § 1108; also, pp. 194, 424; Vol. 2, pp. 6, 8, 23. Our own cases: *McMeekin* vs. *Edwards*, 1 Hill Ch., 288, and the cases cited therein notably; 2 P. Williams, 203, and 2 Vesey, § 516; also, *Bank* vs. *Toomer*, 2 Hill, 27, where it is said "that the preponderance of authority" is to the effect "that the purchaser must be a party to the fraud."

All that is contended for under this head is, that however good a case the plaintiff may have as a defense to the action for foreclosure, when brought by these defendants, still it does not, as against these defendants, entitle her to affirmative relief in equity. In this regard she has mistaken her forum. And it will be observed that almost all the cases cited as authorities are where the party claiming to be defrauded appears as defendant.

As to the third general head, that the decree is contrary to the law and the evidence, it is submitted that the same has been fully argued under the two previous general heads of the exceptions.

In answer to the plaintiff's ground of appeal, on the subject of costs, we would respectfully submit that if our view of the case be correct the plaintiffs should pay the costs to these defendants; but if, on the other hand, the decree below is correct, then it cannot be doubted but that the costs in the case, being one of pure equity, is entirely in the discretion of the Court below. And surely no more proper case could be found where the costs should be laid upon the defaulting defendant, Houston, or all costs disallowed the plaintiff, which latter is apt to be the practical effect of the decree on this point. The Referee's fee, of course, must then be equally divided between the plaintiff and these defendants, as it is not believed that anything can be collected from Houston.

*Marshall*, contra.

August 29, 1877. The opinion of the Court was delivered by

McIVER, A. J. The object of this action is to have a bond and mortgage of real estate, which had been signed in due form by the plaintiff, in the presence of two subscribing witnesses, in favor of the defendants, Scott & Son, canceled, upon the ground that the plaintiff had been induced to sign the same by the false and fraudulent representations of the defendant Houston that the paper she was signing was only a recognizance for his appearance at the

Court of Sessions to answer to an indictment to be preferred against him, whereas, in fact, the bond was the joint and several obligation of Houston and the plaintiff to pay Scott & Son $1,000 one year from its date, secured by a mortgage of real estate, the property of the plaintiff, signed by the plaintiff alone. The defendants, Scott & Son, in their answer, (the other defendant, Houston, having made default,) deny all knowledge or suspicion of the fraud alleged, and say that, having received the bond and mortgage for full consideration and without notice or suspicion of the fraud alleged, the plaintiff has no cause of action against them, but that, if she has suffered loss, it is the result of her own misplaced confidence in the defendant Houston, and to him alone must she look for redress. The issues of law and of fact having been referred to a Referee, he made his report, wherein he finds as matters of fact:

1. That the bond and mortgage were executed by the plaintiff, but that she was induced to do so by the false and fraudulent representations of Houston that they were nothing but a bond for his appearance at Court.

2. That upon the execution of these papers they passed into the hands of Houston, who very soon afterwards delivered them to Scott & Son "to secure a debt of some $1,600 which he owed them for so much money by them lent and advanced to him; that upon receiving from the said C. J. Houston the said bond and mortgage deed, the defendants, Edwin J. Scott & Son, delivered and returned to said C. J. Houston other securities for his said debt which he had previously deposited with them, amounting to a large sum, and that when the said bond and mortgage deed were so delivered to them by the said C. J. Houston, they, the said Edwin J. Scott & Son, had no knowledge, notice or suspicion of the said fraudulent means by which said C. J. Houston had procured the said bond and mortgage from the said plaintiff."

And he finds as matter of law that the bond, so far as the liability of the plaintiff thereon is concerned, and the mortgage are invalid, and that she is entitled to have the same delivered up and canceled, and that the costs should be paid by defendant Houston.

To this report exceptions were filed, both by the plaintiff and by the defendants, Scott & Son, which, being overruled by the Circuit Judge, are again presented here by way of appeal. The defendants, Scott & Son, take several exceptions, as well to the findings of fact as to the conclusions of law, which, from the view we take

of this case, it will be unnecessary to consider in detail.  For, while this is a case in which it would be entirely competent for this Court to review the findings of fact as well as the conclusions of law of the Court below, and while such review might well be invited by the conflict in the testimony, which seems to have been so great that the able and experienced Referee could only reach his conclusions after much hesitation, prompting him to a suggestion that perhaps the safer and more satisfactory course would have been to have submitted the issue of fraud to a jury, in which suggestion we fully concur, though, of course, we are not to be understood as interfering with the right of parties to choose their own mode of trial by ordering such a trial, yet, as the case must go back for a new trial upon another ground hereafter to be noticed, we do not propose to prejudice the interest of either party upon such new trial by giving expression to any views which we might take of the testimony.   The only question, therefore, which we propose to consider is that raised by one of the exceptions taken by the defendants, Scott & Son, namely, whether it is not necessary that it should be made to appear not merely that the plaintiff was induced by the fraud of a third person (Houston) to sign the bond and mortgage, but that, *without negligence* on her part, she was so induced to sign these papers, before she can ask the Court for the relief demanded against the holders, who were innocent of any knowledge of such fraud at the time they, for valuable consideration, took such bond and mortgage.   It will be observed that this is a case in which the plaintiff seeks relief, which was formerly obtainable alone in a Court of equity, and the rule of that Court, which we consider still binding on this Court in the adjudication of a case to which it is appropriate, notwithstanding the fact that the Court of Equity has been abolished, was that " a party coming into a Court of equity is bound to show that his title to relief is unmixed with any gross misconduct or *negligence* of himself or his agents."—Story Eq., § 105.   Chief Justice Marshall, also, in *Marine Insurance Company* vs. *Hodgson*, (7 Cr., 332,) seems to have recognized the correctness of this rule.   In speaking of the power of a Court of equity to restrain parties from availing themselves of the benefit of judgments obtained at law, he uses this language: " It may safely be said that any fact which clearly proves it to be against conscience to execute a judgment  *  *  *  of which he might have availed himself at law, but was prevented by fraud or

accident, *unmixed with any fault or negligence in himself or his agents,* will justify an application to a Court of Chancery." (See, also, *Penny* vs. *Martin,* 4 Johns. Ch., 566.)

Again, Story, in Section 200, *a,* in speaking of a purchaser who asks to be relieved from a purchase made on the ground of misrepresentations by the vendor, says: "If he does not avail himself of the knowledge or means of knowledge open to himself or his agents, he cannot be heard to say that he was deceived by the vendor's misrepresentations. * * * It is his own folly and *laches* not to use the means of knowledge within his reach, and he may properly impute any loss or injury in such a case to his own negligence and indiscretion. Courts of equity do not sit for the purpose of relieving parties, under ordinary circumstances, who refuse to exercise a reasonable diligence or discretion." This rule, which has received the sanction of this eminent text writer, as well as of Courts of the highest authority, is but the expression of a natural feeling of equity which would prompt any just man to say that where one comes into a Court of equity and asks, against an innocent party, the interposition of its extraordinary powers, to protect him from danger or loss occasioned by the fraud of a third party, he ought to be required to show that he has in no way, either by his misconduct or negligence, contributed to the perpetration of the fraud, from the consequences of which he seeks to be relieved at the expense of such innocent party. An examination of the decided cases, which seem to be but few in number, will show that this rule has been applied even by Courts of law in cases analogous to the one now under consideration. In *Foster* vs. *McKinnon,* 38 L. J. R., (N. S.) 310, which may be regarded as the leading case, the action was by the endorsee, a holder for value before maturity without notice of any fraud against the endorser of a bill of exchange, and the defense set up was that the endorsement had been obtained by fraud, the party obtaining it representing to the defendant that the paper he was signing was nothing but a guaranty. The jury were instructed that if the defendant signed not knowing that it was an endorsement, but being induced by the fraudulent and false representations made to him to believe that it was a mere guaranty, *and if the defendant was not guilty of any negligence in so signing the paper,* then the defendant would be entitled to the verdict. On a rule for a new trial this instruction was endorsed as correct, and the Court, per Byles, J., in delivering its opinion, uses

this language: " It seems plain, on principle and authority, that if a blind man or a man who cannot read, or who for some reason (*not implying negligence*) forbears to read, has a written contract falsely read over to him, the reader misreading to such a degree that the written contract is of a nature altogether different from the contract pretended to be read from the paper which the blind or illiterate man afterwards signs, then, at least, *if there be no negligence*, the signature so obtained is of no force." And after citing *Thoroughgood's* case, 2 Co. Rep., 9 *b*, and other cases, says: "Accordingly it has been recently decided in the Exchequer Chamber that if a deed be delivered and a blank left therein be afterwards improperly filled up, (*at least if this be done without the grantor's negligence*,) it is not the deed of the grantor."—*Swan* vs. *The North British Australasian Co.*, 2 Hurls, &c., 175 S. C. 32, L. J. R. 573. A new trial was, however, granted upon the ground that the verdict was against the evidence. And although it is not so stated, the facts of the case would seem to imply that the Court was not satisfied with the verdict upon the question of negligence, and this is the inference drawn by the Court in the case of *Chapman* vs. *Rose*, hereinafter cited. In the case of *Douglass* vs. *Matling*, (26 Iowa, 498, 4 Am. Rep., 238,) the action was on a negotiable note ˙by an innocent holder before maturity for value, and the defense was that the maker had been induced to sign under the false and fraudulent representation that the paper was of a different character from what it proved to be. The Court held the maker liable, saying: " It would be manifestly unjust to permit the maker, while admitting the genuineness of his˙signature, to defeat the note on the ground that, through his own culpable carelessness while dealing with a stranger, he signed the instrument without reading it or attempting to ascertain its true contents. * * * * The maker had it in his power to protect himself from the fraud, but failed to do so. When the consequences of this act are about to be visited upon him he seeks to make another bear it, on the ground that he was defrauded through his own gross negligence."

*Garrarel* vs. *Hadden*, (67 Penn. St., 5 Am. Rep., 412,) was also an action on a negotiable note, by an innocent holder, before maturity, and the defense was that the note, which was on a printed form, had been altered by the insertion of the words "and fifty" in the blank space left after the word "hundred." The Court held the maker liable on the ground of his negligence in not taking some

precaution, as, for example, by scoring the blank space with his pen, by which such alteration could have been prevented or detected. The Court places its decision upon the maxim cited from Story, § 387: "That where one of two innocent persons must suffer, he shall suffer who, by his own acts, occasioned the confidence and the loss," and from the doctrine cited from the same author, as "but an elaboration of a great principle of justice, that if one, by his own acts, or silence or negligence, misleads another, or in any manner affects a transaction, whereby an innocent person suffers a loss, the blamable party must bear it." In the case of *Chapman* vs. *Rose*, (56 N. Y., 137, 15 Am. Rep., 401,) the action was on a negotiable note by an innocent holder before maturity, and the defense was that defendant's signature had been obtained by the false representations of the payee that the paper was an order for a hay fork and two pulleys, instead of a promissory note, as it proved to be. It was held that the maker, if guilty of negligence in signing the paper, would be liable, notwithstanding the fact that he was induced by the payee to believe that the paper signed was a mere order of the kind above stated and not a promissory note. The Court reviews the authorities, and rests its decision, not upon any doctrine peculiarly applicable to negotiable paper, but upon a principle stated in the following language: "He who, by his carelessness or undue confidence, has enabled another to obtain the money of an innocent person, shall answer the loss. If it be objected that there must be a duty of care in order to found an allegation of negligence upon the neglect of it, it must be answered that every man is bound to know that he may be deceived in respect to the contents of a paper which he signs without reading. When he signs an obligation without ascertaining its character and extent, which he has the means to do, upon the representations of another, he puts confidence in that person, and if injury ensues to an innocent third person, by reason of that confidence, his act is the means of the injury, and he ought to answer to it." In the *Citizens' National Bank* vs. *Smith*, (55 N. H., 593, reported also in 3 Cent. Law Jour., 163,) the subject is fully discussed, and, after a review of the authorities, the conclusion is reached that, to sustain such a defense, it is necessary to show that the maker was not guilty of negligence; and this doctrine is based upon the broad general principle that "whenever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss

must sustain it," and not upon any doctrines peculiar to negotiable notes.

The case of *Brown* vs. *Reed*, decided by the Supreme Court of Pennsylvania in November, 1875, and reported in 3 Cent. Law Jour., 83, is somewhat peculiar in this respect: that the paper in question was not, in its inception, in the form of a negotiable note, but was, when it was signed, nothing but an agreement in writing, by which the maker bound himself to pay to the payee or bearer $50 whenever he should sell $250 worth of hay and harvest grinders, and was signed by Brown, "agent for hay and harvest grinders." But, by an ingenious device, the paper was so written that, by cutting it into two pieces, one of them, to all appearances, would be a perfect promissory note, with the name of Brown signed to it, without the addition of the words "agent for hay and harvest grinders;" and upon this piece of paper the action was brought by Reed, an innocent holder, for value, before maturity. The defense was that no such paper had ever been signed by the maker, and yet the Court held that negligence of the maker, which was a question for the jury to pass upon, would preclude such a defense. Now, while it is true that in the most of these cases the question arose under actions brought on negotiable notes by innocent holders for value before maturity, it is equally true, as we have seen, that the decisions are not based. upon any doctrines peculiar to negotiable paper; for, although the Judges have, in some of the cases, fortified their conclusions by suggesting the tendency that a contrary rule would have to destroy confidence in commercial paper, such suggestions are merely additional reasons for, and do not constitute the basis upon which, such decisions rest. This is obvious from the consideration that the very gist of such a defense is that the paper sued upon is *not* a negotiable paper; for, while it is so in form, yet the fact that the signer was deceived into the act of signing, that "his mind never went with his act," that "he never intended to sign, and, therefore, in contemplation of law, never did sign, the contract to which his name is appended," it is argued, deprives it of that character and demonstrates that it is *not* his note. This defense must necessarily be placed upon this ground, as it cannot possibly stand upon any other; for the very moment it is conceded that the paper in question *is* the negotiable note of the maker, it immediately becomes subject to the incidents which belong to such a paper in the hands of an innocent holder for

value before maturity. How, then, a defense, which necessarily rests upon the theory that the paper in question is *not* a negotiable paper, can be said to derive its efficacy from doctrines peculiar to negotiable paper, it is difficult to perceive.

This seems to be the view taken by Dixon, C. J., in *Walker* vs. *Egbert*, (29 Wis., 194, 9 Am. Rep., 548,) where, in discussing this question, he uses this language: "The inquiry in such cases goes back of all questions of negotiability, or of the transfer of the supposed paper to a purchaser, for value, before maturity and without notice. It challenges the origin or existence of the paper itself; and the proposition is to show that it is not in law or in fact what it purports to be, namely, the promissory note of the supposed maker. For the purpose of setting on foot or pursuing this inquiry, it is immaterial that the supposed instrument is negotiable in form, or that it may have passed to the hands of a *bona fide* holder for value. Negotiability in such cases presupposes the existence of the instrument as having been made by the party whose name is subscribed; for, until it has been so made, and has such actual legal existence, it is absurd to talk about a negotiation or transfer, or *bona fide* holder of it, within the meaning of the law merchant. That which, in contemplation of law, never existed as a negotiable instrument, cannot be held to be such; and to say that it is and has the qualities of negotiability because it assumes the form of that kind of paper, and thus to shut out all inquiry into its existence, or whether it is really and truly what it purports to be, is *petitio principii*—begging the question altogether. * * For the purposes of this first inquiry, which must be always open when the objection is raised, it is immaterial what may be the nature of the supposed instrument, whether negotiable or not, or whether transferred or negotiated, or to whom or in what manner, or for what consideration or value paid by the holder. * * * * In these and all like cases no additional validity is given to the instruments by putting them in the form of negotiable paper." While it may be very true, as a general rule, that a party ought not to be bound by a mere mechanical act which his mind did not accompany, because such act is not, in truth, the act of the party, it is equally true that such party may, by his acts or omissions, be estopped from denying that he did such act; for we know that it not unfrequently happens that parties, by reason of some act or omission on their part, debar themselves from taking positions which, abstractly considered, are

incontestably correct, both in law and in fact. Now, in this case, the plaintiff knew that she was signing some kind of written obligation, and if she, through carelessness or negligence, signed a paper of a different character from that which she intended, and that paper has been received by an innocent third person, for value, she ought not to be allowed, when called upon to respond to the obligations imposed by terms of the paper, to say: "It is true I performed the mechanical act of signing the paper, but my mind did not accompany the act, and, therefore, it is not in reality my act, and I am not bound by it," unless she can at the same time say that the act, which she now disavows, was brought about solely by the fraud of a third person, and was in no way occasioned by or resulted from any fault or negligence on her part; still less ought she to be allowed to say this when she invokes the active aid of the Court, by the exercise of its extraordinary powers, to relieve her from the consequences of such an act at the expense of an innocent third person, unless she can show that these consequences are in no way attributable to any fault or negligence on her part. This would be allowing a party in a Court of equity, in violation of every principle governing such a Court, to trace his title to relief through his own misconduct or negligence. There are other cases in which the question of negligence has been recognized as an important and necessary inquiry.—*Putnam* vs. *Sullivan*, 4 Mass., 54; *Gibbs* vs. *Linabury*, 22 Mich., 479, 7 Am. Rep., 675; *Walker* vs. *Egbert*, 29 Wis., 194, 9 Am. Rep., 548; and even *Taylor* vs. *Atchison*, 54 Ill., 196, 5 Am. Rep., 118, which, in some of the cases, is cited as an authority to the contrary. This case, however, can have but little influence in determining the question, as it is rested mainly upon the terms of a statute of that State, and in it there is not a single authority cited. We may also add the case of *Burson* vs. *Huntington*, 21 Mich., 417, 4 Am. Rep., 497, in which the question was whether, in an action by an innocent holder, for value before maturity, a person could be made liable who had signed but had not delivered a negotiable note, it having been taken from the table by the payee, where the parties were sitting engaged in a negotiation which had not been completed, during a temporary absence of the maker. The Court, in discussing this case, after declining to apply to it the rule that where one or two innocent parties must suffer, the loss must fall upon him by whose act or omission it was caused, upon the ground that such rule "is mainly confined to cases where

the party who is made to suffer the loss has reposed a confidence in the third person whose acts have occasioned the loss," uses this language: "We do not assert that the general rule we are discussing (that where one of two innocent parties must suffer, &c.) must be confined exclusively to cases where a confidence has been placed in some other person (in reference to delivery) and abused. There may be cases where the culpable negligence or recklessness of the maker in allowing an undelivered note to get into circulation might justly estop him from setting up non-delivery."

The decision of the Court below is based upon the authority of *Thoroughgood's* case (2 Coke, 9 *b*,) and the case of *Schuylkill County* vs. *Copley*, (67 Penn. St., 386, 5 Am. R., 441); but even *Thoroughgood's* case seems to recognize the question of negligence as important to be considered in cases of this kind; for in the second resolution we read: "That such layman, not learned, is not bound to deliver the deed if there be not one present which can read the deed to him in such language that he who should make the deed may understand it; and that is the reason that if it be read to him in other words than are contained in the writing, it shall not bind the party who delivereth it, for it is at the peril of the party to whom the writing is made that the true effect and purport of the writing be declared, *if it be required, but if the party who should deliver the deed doth not require it, he shall be bound by the deed, although it be penned against his meaning.*" Now, does not this necessarily imply that if the grantor is guilty of negligence he shall be bound? For the doctrine announced in this case rests upon the idea that, as the mind of the party did not accompany the merely physical act of signing, it is not in reality his act, and, therefore, he is not bound; and yet in this second resolution two conditions of things are presented, in neither of which does the mind of the grantor go with the physical act of signing—one where the deed, at the request of the grantor, an illiterate person, is read wrongly, in which case the grantor is *not* bound. Why? Because he has used proper precautions to inform himself of what he was signing; the other where the grantor omits to require the reading of the deed, in which case he is bound by the deed, "although it be penned against his meaning." Why? Because he has omitted to use proper precautions to protect himself, that he has been guilty of negligence. In the case of *Schuylkill County* vs. *Copley*, it was held that where an illiterate person signed a paper which was falsely

represented to be a petition, but which was really a bond, he was not liable thereon, although the obligee was not aware of the fraud until after the bond had been accepted. The only controversy in this case, not mentioning a question of evidence irrelevant to the matter we are considering, was whether the obligor would be liable unless it was shown that the obligee was aware of the fraud before accepting the bond, and this is the only point that can be said to have been decided. No question of negligence was raised or considered in the case; and, therefore, this case cannot be regarded as any authority upon the question now under consideration by this Court. So, too, the case of *Jackson* vs. *Hayne*, (12 Johns., 469,) cited to sustain the decision below, cannot be regarded as authority upon the question we are considering, for there the action was by a purchaser at Sheriff's sale, to which the doctrine of *caveat emptor* applies, the purchaser only getting whatever title the defendant in execution may have had, and of course, therefore, if the assignment of the lease under which such defendant held was void for fraud, the purchaser, though innocent of any participation in or knowledge of such fraud, bought nothing. The cases of *Green* vs. *Buffalo* (6 P. F. Smith, 110,) and *Gourdin* vs. *Read*, (8 Rich., 230,) which were also cited in support of the Circuit judgment, do not, in our opinion, conflict with the view we take of this case; for in the former the abstract proposition, taken from the first resolution in *Thoroughgood's* case, is announced as law. But the Court did not have occasion to consider, and did not decide, the point which is now under consideration; and in the latter the only point decided is, that if a surety on a bond who, by parol, has authorized his principal to fill up blanks in the bond with the date and name of the obligee, has, before such blanks are filled, revoked such authority, he would not be liable to the obligee, whose name had been subsequently inserted, even though such obligee had no notice of such revocation when he took the bond, and hence it cannot affect the question now before the Court.

The case of *Briggs* vs. *Ewart* (51 Mo., 245, 11 Am. R., 445,) is also relied on as authority for the proposition that negligence of the maker cannot affect the inquiry; but an examination of that case will show that no such point was there decided, and, on the contrary, the instruction asked for, which, on exception, was endorsed, recognized the qualification of negligence, although the Judge who delivered the opinion of the Court did seem to ignore

the question of negligence as an unnecessary and unimportant inquiry in a case of this kind. But the same Court, in the subsequent case of *Shirts* vs. *Overjohn*, decided in May, 1875, and reported in 2 Cent. Law. Jour., 423, decided that "where it appears that the party sought to be charged intended to bind himself by some obligation in writing, and voluntarily signed his name to what he supposed to be the obligation he intended to execute, having full and unrestricted means of ascertaining for himself the true character of such instrument before signing the same, but by his failure to inform himself of its contents, or by relying upon the representations of another as to the contents of the instrument presented for his signature, signed and delivered a negotiable note in lieu of the instrument intended to be signed, he cannot be heard to impeach its validity in the hands of a *bona fide* holder." In this case the Court, with a view, doubtless, to correct any misapprehension which the language used by the Judge who delivered the opinion in *Briggs* vs. *Ewart* might give rise to, says: "In the cases of *Briggs* vs. *Ewart* (51 Mo., 245,) and *Martin* vs. *Smylee*, (55 Mo., 577,) which were similar to the case at bar, the instructions which were brought under review, and which received the approval of this Court, declared the law to be that a person signing a promissory note could not be held liable as maker by a *bona fide* holder, if his signature was obtained *without his fault or negligence*, on the fraudulent representations of the payee that the paper offered for signature was not a note, and that the party sought to be charged did not know it was a note and did not intend to sign a note. Some observations, however, of the Judge who delivered the opinion of the Court in the case of *Briggs* vs. *Ewart* seem to reject the qualification of negligence and to announce the broad doctrine that, to be binding, the instrument must be executed as and for the paper it purports to be, and if the party to be charged did not intend to make a promissory note he cannot be held bound even in favor of a *bona fide* holder for value. These observations and the subsequent case of *Corley* vs. *Weddle*, (57 Mo., 452,) in so far as it is based upon them, are disapproved."

This question of negligence seems to have been wholly ignored, both by the Referee and the Circuit Judge, although distinctly made and insisted upon by the defendants, Scott & Son; for, although it is stated in the brief submitted by the counsel for the plaintiff that the Referee found "that the plaintiff was guilty of

no negligence," we have been utterly unable, after a most careful examination of the report, to discover any such finding, or even any evidence that the Referee considered the question at all, and we must, therefore, conclude that this statement in the brief of the plaintiff's counsel is an error, doubtless altogether inadvertent.

Holding, then, as we do, that the question whether the plaintiff was guilty of negligence in allowing herself to be imposed upon by Houston, if, in fact, she was so imposed upon, is not only an important, but an essential inquiry, and this question not having been passed upon by the Court below, the case must go back for a new trial. It is, therefore, unnecessary, at this time, to consider the question of costs raised by the plaintiff's exception.

A new trial is ordered.

*Willard*, C. J., concurred.